GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
DHANANJAY S. MANTHRIPRAGADA, SBN 254433
  dmanthripragada@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

MICHELE L. MARYOTT, SBN 191993
  mmaryott@gibsondunn.com
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone:    949.451.3945
Facsimile:    949.475.4668

Attorneys for Defendant POSTMATES INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMAL ADAMS, et al.,<br><br>                Petitioners,<br><br>    v.<br><br>POSTMATES INC.,<br><br>                Respondent. | CASE NO. 3:19-cv-03042<br><br>**RESPONDENT POSTMATES INC.'S OPPOSITION TO PETITIONERS' MOTION TO COMPEL ARBITRATION**<br><br>*[Declarations of Ashley Campbell, Theane Evangelis and [Proposed] Order Filed Concurrently Herewith]*<br><br><u>**Hearing:**</u><br>Date:      July 10, 2019<br>Time:     2:00 p.m.<br>Judge:   Hon. Saundra B. Armstrong |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................ 1

II. FACTUAL AND PROCEDURAL BACKGROUND ........................................................... 2

    A. Independent Contractor Couriers Agree to Resolve Disputes with Postmates in Arbitration on an Individual Basis ................................................................................ 2

    B. By Agreeing to the Mutual Arbitration Provision, Couriers Agree to Initiate and Conduct Arbitrations in a Specified Manner .............................................................. 4

    C. In March 2019, Keller Lenkner Threatens to Bring a *De Facto* Class Arbitration in an Attempt to Shake Down Postmates Using the AAA's Billing Practices ............................................................................................................................ 5

    D. Keller Lenkner Purports to Initiate Arbitration by Listing Thousands of Names on One Document, and AAA Administers the Purported Demands Collectively ........ 5

    E. In June 2019, Keller Lenkner Rushes to Court During Discussions with AAA ........... 7

III. ARGUMENT ....................................................................................................................... 8

    A. Petitioners' Class Arbitration Demands Violate the Law and the Fleet Agreement ...................................................................................................................... 9

    B. The Fleet Agreement's Delegation Clause Does Not Justify the Relief Petitioners Seek .......................................................................................................... 13

IV. CONCLUSION ................................................................................................................... 15

Gibson, Dunn & Crutcher LLP

RESPONDENT POSTMATES INC.'S OPPOSITION TO PETITIONERS' MOTION TO COMPEL ARBITRATION – CASE NO. 3:19-CV-03042

1

# TABLE OF AUTHORITIES

2

Page

3

**Cases**

4

5

*Abadilla v. Uber Techs., Inc.*,
    Case No. 3:18-cv-07343-EMC (N.D. Cal. filed Dec. 5, 2018)......................................14

6

*Allied-Bruce Terminix Co., Inc. v. Dobson*,
    513 U.S. 265 (1995)....................................................................................................9

7

8

*AT & T Mobility LLC v. Bernardi*,
    2011 WL 5079549 (N.D. Cal. Oct. 26, 2011)................................................10, 11, 13

9

10

*AT & T Techs., Inc. v. Comm's Workers of Am.*,
    475 U.S. 643 (1986)....................................................................................................8

11

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)....................................................................................2, 9, 10, 15

12

13

*Brown v. Keller Lenkner, LLC*,
    Case No. 1:18-cv-12423-NMG (D. Mass. 2018)........................................................14

14

15

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996)......................................................................................12

16

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001)....................................................................................................9

17

18

*Coleman v. Quaker Oats Co.*,
    232 F.3d 1271 (9th Cir. 2000)..................................................................................13

19

20

*Dalton v. Lee Publications, Inc.*,
    625 F.3d 1220 (9th Cir. 2010)..................................................................................12

21

*Desert Empire Bank v. Insurance Co. of N. Am.*,
    623 F.2d 1371 (9th Cir. 1980)..................................................................................13

22

23

*Desimoni v. TBC Corp.*,
    2017 WL 1381600 (M.D. Fla. Apr. 18, 2017) ..........................................................11

24

*Diva Limousine v. Uber Techs., Inc.*,
    Case No. 3:18-cv-05546-EMC (N.D. Cal. Jan. 9, 2019) ..........................................15

25

26

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018)....................................................................................9, 10, 15

27

28

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995)..............................................................................................8, 14

RESPONDENT POSTMATES INC.'S OPPOSITION TO PETITIONERS' MOTION TO COMPEL ARBITRATION –
CASE NO. 3:19-CV-03042

*Gen. Dynamics Corp. v. United States*,
    139 F.3d 1280 (9th Cir. 1998)................................................................................11

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019) ................................................................................9, 14

*Lee v. Postmates Inc.* (*Lee I*),
    2018 WL 4961802 (N.D. Cal. Oct. 15, 2018) ...............................................3

*Lee v. Postmates Inc.* (*Lee II*),
    2018 WL 6605659 (N.D. Cal. Dec. 17, 2018) ...............................................2

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010)................................................................................10, 14

*Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
    489 U.S. 468................................................................................8

**Statutes**

9 U.S.C. § 1, *et seq*................................................................................8

9 U.S.C. § 4................................................................................8, 13

**Other Authorities**

California's Ethics Standards for Neutral Arbitrators in Contractual Arbitration,
    https://www.courts.ca.gov/documents/ethics_standards_neutral_arbitrators.pdf.........................12

H.R. Rep. No. 97-542 (1982)................................................................................9

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.        INTRODUCTION

This is a shakedown.  Petitioners' defective arbitration demands are nothing more than an attempted end-run around valid class action waivers that bar their attempt to proceed simultaneously on behalf of thousands of individuals.  Keller Lenkner, the law firm purporting to represent Petitioners, asserts that it has filed 5,257 arbitration demands on behalf of couriers who have performed work on the Postmates, Inc. ("Postmates") platform.  In reality, it filed *one* demand (which, weeks later, it copied and pasted thousands of times) on behalf of 5,257 couriers, in violation of the express class action waiver in the parties' arbitration agreement.  It did so to exploit a loophole in the American Arbitration Association's ("AAA") rules, which AAA claims allows it to immediately assess to the respondent a $1,900 case administration fee *for each claimant* alleging worker misclassification before the case can proceed to an arbitrator.  And AAA will collectively administer and assess those aggregate fees on a respondent: (1) even where the purported arbitration demands are completely generic and identical, do not set forth any facts specific to any particular individual, and do not comply with the party's agreement prohibiting collective arbitration; (2) without any proof establishing that counsel purporting to represent a claimant *actually* represents that claimant; (3) without taking into account that counsel for those claimants—a law firm that lists only twelve lawyers on its website—obviously cannot pursue 5,000+ arbitrations at once; (4) without conducting any inquiry into whether the claimants actually used the Postmates platform; (5) without even a cursory evaluation of whether the parties' arbitration agreement either covers the disputes alleged, or whether the threshold steps required by that agreement have been met by the purported claimants; and (6) without requiring counsel for claimants to meet their obligations to pay even a modest a filing fee as they would in court.

Recognizing that they could use these AAA billing practices as leverage, Keller Lenkner sent Postmates a letter in March 2019 stating that it represented "more than 3,000" couriers who had allegedly been misclassified as independent contractors that revealed that they intended to use arbitration fees to extort a quick settlement from Postmates.  Keller Lenkner threatened that unless Postmates entered into a settlement or waived the arbitration governing its relationship with couriers,

it would demand arbitration on behalf of all of its clients, "obligat[ing] Postmates to pay AAA more than $20 million" just to begin arbitration.  When Postmates refused this extortionate demand, Keller Lenkner purported to demand arbitration on behalf of 5,257 couriers, which led AAA to assess ***$11,022,400*** in administrative fees, even though these purported demands completely disregard the parties' arbitration agreement, including its unambiguous class action waiver.

Keller Lenkner now seeks this Court's aid in its extortion scheme, and has moved to compel Postmates to pay those fees immediately.  Postmates is, and always has been, willing to arbitrate any claims that are properly submitted to arbitration pursuant to its arbitration agreement with couriers.  But Keller Lenkner's defective demands are an attempt to circumvent the class action waiver in the parties' agreement and clear Supreme Court precedent disfavoring class arbitration, which "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011).  That not only describes the result of Petitioners' strategy; it illustrates their deliberate aim to fundamentally undermine the viability of arbitration as an alternative to litigation.  This Court should not condone Petitioners' gamesmanship.  Postmates therefore respectfully requests that this Court deny Petitioners' motion and allow the parties to work through a resolution of the disputed billing and procedural issues with AAA.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Independent Contractor Couriers Agree to Resolve Disputes with Postmates in Arbitration on an Individual Basis.

Postmates' online and mobile platform connects communities to a broad array of local businesses and local independent contractor couriers for prompt "on-demand" local hand-delivery of food and other items.  Campbell Decl. ¶ 2.

Individuals who sign up to use the Postmates platform to make deliveries accept the terms of the Fleet Agreement, which governs the relationship between Postmates and independent contractor couriers.  *Id.* ¶ 3.  The Fleet Agreement clearly provides that couriers are independent contractors and

contains a conspicuous Mutual Arbitration Provision, which couriers may opt out of if they choose.[1] *See Lee v. Postmates Inc.* (*Lee II*), 2018 WL 6605659, at \*6 (N.D. Cal. Dec. 17, 2018) (holding that Postmates' Fleet Agreement provides reasonable notice of the Mutual Arbitration Provision); *Lee v. Postmates Inc.* (*Lee I*), 2018 WL 4961802, at \*4 (N.D. Cal. Oct. 15, 2018) (same).

Couriers who accept the Fleet Agreement and do not exercise their right to opt out of the Arbitration Provision agree to resolve any disputes with Postmates in *individual* arbitration:

> PLEASE REVIEW THIS AGREEMENT CAREFULLY.  SPECIFICALLY, PLEASE REVIEW THE MUTUAL ARBITRATION PROVISION . . . , WHICH REQUIRES THE PARTIES (UNLESS YOU OPT OUT OF ARBITRATION AS PROVIDED BELOW) TO RESOLVE DISPUTES ON AN INDIVIDUAL BASIS, TO THE FULLEST EXTENT PERMITTED BY LAW, THROUGH FINAL AND BINDING ARBITRATION."

Campbell Decl. ¶ 4, Ex. A.  All-caps text on the first page of the 2018 and April 2019 Fleet Agreements also provides that "unless [couriers] opt out of arbitration," they must resolve disputes "on an *individual* basis" through "final and binding arbitration." *Id.* Exs. A, B (emphasis added).

The Mutual Arbitration Provision contains an express class action waiver, which prevents couriers from bringing any "class and/or collective action":

> **CLASS ACTION WAIVER—PLEASE READ.** Postmates and You mutually agree that any and all disputes or claims between the Parties will be resolved in individual arbitration. The Parties further agree that by entering into this Agreement, they waive their right to have any dispute or claim brought, heard or arbitrated as a class and/or collective action, or to participate in any class and/or collective action, and an arbitrator shall not have any authority to hear or arbitrate any class and/or collective action ("Class Action Waiver").

Campbell Decl. ¶ 5 & Exs. A § 11B(ii), B § 10B(ii).  Similarly, couriers who agree to the Mutual Arbitration Provision agree that they may not pursue representative actions:

> **REPRESENTATIVE ACTION WAIVER—PLEASE READ.** Postmates and You mutually agree that any and all disputes or claims between the Parties will be resolved in individual arbitration. The Parties further agree that by entering into this Agreement, they waive their right to have any dispute or claim brought, heard or arbitrated as a representative action, or to participate in any representative action, including but not limited to, claims brought under any state's Private Attorneys General Act (PAGA), and an arbitrator shall not have any authority to arbitrate a representative action ("Representative Action Waiver").

*Id.* ¶ 5 & Exs. A § 11B(iii), B § 10B(iii).

---

[1]   As the Mutual Arbitration Provision makes clear, "[a]rbitration is not a mandatory condition of [couriers'] contractual relationship with Postmates," and couriers can opt out of the Mutual Arbitration Provision if they so choose.  Campbell Decl. ¶ 6 & Exs. A § 11B(ix), B § 10B(ix).  To opt out, couriers may submit written notice of their intention to opt out within 30 days of accepting the Fleet Agreement.  *Id.*

The Arbitration Provision also contains a delegation clause: "any dispute relating to the interpretation, applicability, enforceability, or formation" of the Mutual Arbitration Provision must be decided by an arbitrator, not a court. *Id.* Exs. A § 11A(ii), B § 10A(ii). But "the preceding clause shall not apply to any dispute relating to or arising out of the Class Action Waiver and Representative Action Waiver, *which __must__ proceed in a court of competent jurisdiction and cannot be heard or arbitrated by an arbitrator*." *Id.* Ex. B § 10A(ii) (emphasis added).

**B.     By Agreeing to the Mutual Arbitration Provision, Couriers Agree to Initiate and Conduct Arbitrations in a Specified Manner**

The Mutual Arbitration Provision designates a particular manner in which a party wishing to initiate an arbitration (whether Postmates or an independent contractor courier) may do so: "the initiating Party *must*" serve upon the responding party a "demand for arbitration [which] *must* include (1) the name and address of the Party seeking arbitration, (2) a statement of the legal and factual basis of the claim, and (3) a description of the remedy sought." *Id.* Exs. A § 11B(i), B § 10B(i) (emphasis added). Further, any demand for arbitration triggered by an independent contractor courier "*must* be delivered to Postmates" at a specific address. *Id.*

The Mutual Arbitration Provision also states that "[a]ny arbitration shall be governed by the AAA [Commercial] Rules," with several exceptions, most of which are not relevant here, except that "[t]he arbitration shall be heard by one arbitrator selected in accordance with the AAA Rules" and "shall be an attorney with experience in the law underlying the dispute;" and that the parties "shall equally share filing fees and other similar and usual administrative costs, as are common to both court and administrative proceedings. Postmates shall pay any costs uniquely associated with arbitration." *Id.* Ex. A § 10B(vi).[2]

Finally, the Mutual Arbitration Provision provides: "*Nothing in this Mutual Arbitration Provision* prevents or *excuses a Party from satisfying any conditions precedent* and/or exhausting administrative remedies under applicable law or as required under this Agreement *before bringing a*

---

[2]  Prior versions of the Fleet Agreement provided that "Postmates shall pay the arbitrator's and arbitration fees and costs." Campbell Decl. Ex. B § 11B(vi). However, the April 2019 Fleet Agreement "supersedes any prior contract between the Parties." *Id.* Ex. A § 12A. And regardless of which Fleet Agreement governs a particular Petitioner's relationship with Postmates (if any), all relevant versions contained substantively identical and unambiguous class, representative, and collective action waivers. *Id.* ¶ 5 & Exs. A § 11B(ii)–(iii), B § 10B(ii)–(iii).

*claim in arbitration*." *Id.* Exs. A, § 11B(vii), B § 10B(vii) (emphasis added).

Postmates and couriers have utilized the arbitration procedures set forth in the Fleet Agreement to resolve numerous disputes, and Postmates is currently engaged in at least fifty arbitrations under the Fleet Agreement. *Id.* ¶ 6.

**C.      In March 2019, Keller Lenkner Threatens to Bring a *De Facto* Class Arbitration in an Attempt to Shake Down Postmates Using the AAA's Billing Practices**

On March 6, 2019, counsel for Petitioners, Ashley Keller, wrote to Postmates' General Counsel, asserting that his firm "represents more than 3,000 Postmates drivers in California and Illinois" who allegedly had been misclassified as independent contractors.  Mr. Keller threatened to "proceed with every arbitration simultaneously" unless the parties could "agree on an alternative process for resolving [his] clients' claims."  Evangelis Decl. Ex. A.  Mr. Keller attached a list of purported clients and two draft arbitration demands—one designed to collectively apply to each purported California client, and a second designed to collectively apply to each purported Illinois client. *Id.* ¶ 3.

Mr. Keller held nothing back in his explanation for why he believed Postmates should abandon the Mutual Arbitration Provision it had entered into with couriers:  "Applying its Employment/Workplace Fee Schedule, AAA will require Postmates to pay a $2,200 filing fee, a $750 administrative fee, and an arbitrator's retainer of $4,000 or more. . . .  Based on 3,000 drivers, proceeding to arbitration would obligate Postmates to pay AAA more than $20 million. . . .  These numbers will continue to grow, as roughly 500 additional drivers engage our firm each week." *Id.*  In short, Keller Lenkner threatened that unless Postmates settled or abandoned its arbitration clause, it would manipulate the arbitration process to exert maximum financial pressure on Postmates.

**D.      Keller Lenkner Purports to Initiate Arbitration by Listing Thousands of Names on One Document, and AAA Administers the Purported Demands Collectively**.

When it became clear that Postmates would not abandon its Mutual Arbitration Provision or pay an exorbitant and unjustified settlement to avoid Keller Lenkner's extortion tactics, Keller Lenkner purported to file 4,925 arbitration demands on April 22, 2019 by sending four documents to AAA:  (1) a cover letter requesting that AAA invoice Postmates for arbitration filing fees related to 4,925 alleged claimants and attaching two versions of Postmates' Fleet Agreement; (2) a single

document setting forth the alleged claimants' grievances in generic terms that were not specific to any particular individual;[3] (3) a spreadsheet listing the 4,925 alleged claimants to whom the claims document purportedly uniformly applied; and (4) a packet of barebones fee waiver applications asserting that 4,593 of the alleged claimants were entitled to fee waivers pursuant to California Code of Civil Procedure § 1284.3, and thus were not responsible for any portion of arbitration fees.  *Id.* ¶ 5 & Exs. B, C.  Keller Lenkner purported to file additional demands in a similar format on May 13, 2019.  *Id.* ¶ 6 & Ex. D.  Neither set of demands was delivered to Postmates by mail, as required by the Fleet Agreement.[4]  *See id.* ¶¶ 5–6.

When a representative from AAA reached out to Postmates to discuss the purported demands collectively, Postmates explained that the demands had not been properly filed in a manner that would trigger any arbitration proceedings (*id.* ¶ 7), but nonetheless agreed to conduct a mediation with Keller Lenkner, and on May 6, 2019, sent AAA a mediator strike list (*id.* ¶ 9).  But Keller Lenkner refused to mediate after May 31, 2019.  *Id.*  The parties were unable to find a suitable mediator on such short notice that was available for a mediation on a date in May that was agreeable to both parties, and Keller Lenkner refused Postmates' offers to mediate in June or July.  *Id.*

On May 31, 2019, a AAA representative left a voicemail with counsel for Postmates requesting its position on whether AAA may properly assess fees for the purported Keller Lenkner arbitration demands.  That same day, Postmates responded by letter that no arbitration proceedings had been triggered because Keller Lenkner's arbitration demands were deficient under the terms of the Fleet Agreement and AAA's rules.  Evangelis Decl. ¶ 10 & Ex. E.  For example, Postmates noted that Keller Lenkner "filed one, mass arbitration demand purporting to cover each claimant, which does not lay out any specific facts, theories, or remedies sought for each claimant, as is required by the Fleet Agreement," and "circumvents the Fleet Agreement's express requirement that all

---

[3]  For example, one of the alleged claims, entitled "Applicable Municipal Codes," lists twenty assorted municipal code provisions from various municipalities around the state of California, and asserts that "in various weeks," various unspecified claimants performed work in various of the listed cities and were not paid minimum wage, and thus, those unspecified "claimants subject to those violations" are entitled to relief.  Evangelis Decl. Ex. C, ¶¶ 62–64.

[4]  On June 11, after filing this action, Petitioners sent new purported arbitration demands to Postmates by mail, but continued to assert generic claims that were copied and pasted across thousands of purportedly individual demands.  Evangelis Decl. ¶ 14.

RESPONDENT POSTMATES INC.'S OPPOSITION TO PETITIONERS' MOTION TO COMPEL ARBITRATION –
CASE NO. 3:19-CV-03042

Gibson, Dunn &
Crutcher LLP

arbitrations must take place on an *individualized* basis." *Id.*  Postmates also noted that the California statutory fee waiver provision that Keller Lenkner cited for the vast majority of its purported clients was not applicable, because, by its very terms, the relevant statute only applies in "consumer arbitration[s]."  Thus, Postmates stated that Keller Lenkner had not met its own filing requirements such to trigger Postmates' obligations.  *Id.*

**E.     In June 2019, Keller Lenkner Rushes to Court During Discussions with AAA**.

The next business day, on June 3, Petitioners filed the Petition for an Order Compelling Arbitration that commenced this action (Dkt. 1) and a Motion to Compel Arbitration (Dkt. 4).  This action has been filed on behalf of all 5,274 purported Keller Lenkner clients[5] altogether, and seeks one, collective order requiring Postmates to pay millions of dollars in fees for all 5,274 Petitioners simultaneously.

Meanwhile, after Petitioners filed this action, AAA wrote to the parties that its practice is to raise gateway disputes regarding any party's fulfillment of conditions precedent to an arbitrator, and that it would decline to administer the purported claims further unless Postmates paid $11,022,400 in "administrative fees" by June 13, 2019.  Evangelis Decl. ¶ 12 & Ex. F.  AAA offered no assurance or suggestion regarding whether, when, or how Postmates could obtain a refund if Petitioners failed to diligently pursue all 5,274 arbitrations.  *See id.*

Postmates responded promptly, explaining that "Postmates is ready to arbitrate individual claims properly brought under the terms of each individual's Fleet Agreement and AAA's rules," but that the purported "[c]laimants have exploited AAA's rules by filing a collective demand and simply referring to it as a group of 'individual' demands."  *Id.* ¶ 13 & Ex. G.  Postmates reiterated that it stands by its arbitration agreement, and is eager to arbitrate any dispute that is *actually brought in a manner that complies with that agreement*:  "Postmates is fully prepared to proceed with—and pay its

---

[5]  Postmates has serious concerns regarding whether Keller Lenkner actually represents each of the 5,274 Petitioners it purports to represent.  Postmates has raised those concerns to Mr. Keller on several occasions (Evangelis Decl. ¶ 8), but Mr. Keller has done little to allay them.  Additionally, Keller Lenkner has yet to provide any explanation whatsoever as to how that twelve-attorney law firm expects to simultaneously prosecute 5,274 arbitration proceedings (*id.*) on top of any other work to which the firm may already be committed (*see Abadilla v. Uber Techs., Inc.*, Case No. 3:18-cv-07343-EMC (N.D. Cal. filed Dec. 5, 2018) (Keller Lenkner purporting to seek to pursue 12,501 simultaneous arbitrations against Uber Technologies, Inc.)).

Gibson, Dunn &
Crutcher LLP

share of the filing fees for—the individual arbitration of any claimant who perfects his arbitration demand, provided that AAA can develop some type of reasonable payment plan that compensates AAA for administration costs *as cases are actually administered and prosecuted*, rather than inequitably and needlessly assessing fees for all cases at filing regardless of when a case will actually be able to proceed." *Id.* (emphasis in original).  On June 17, AAA responded by reiterating its position that Keller Lenkner's identical, collective demands triggered arbitration proceedings and the imposition of millions of dollars of filing fees, and offered Postmates a stay for a price of $300 per claimant (over $1.5 million in total) while the parties litigate this action.  *Id.* ¶ 15 & Ex. H.  Later on June 17, Keller Lenkner responded to AAA's email, asking it to "confirm . . . that AAA will decline to administer the cases."  *Id.* ¶ 15 & Ex. I.

### III.    ARGUMENT

The Federal Arbitration Act ("FAA") 9 U.S.C. § 1, *et seq.*, which governs any arbitration proceeding between Postmates and independent contractor couriers (Campbell Decl. Exs. A, B), allows a court to order disputes to arbitration when a party breaches its agreement to arbitrate (9 U.S.C. § 4).  But the court may order a dispute to arbitration *only* if the parties have expressly agreed to arbitrate that dispute, and *only* in the manner agreed to by the parties.  *Id.* (a court shall compel arbitration "in accordance with the terms of the contract" and only "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue").

This stems from the fundamental principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," meaning that if parties have not agreed to arbitrate a certain dispute, or to arbitrate a certain dispute in a particular manner, a court cannot order them to do so.  *AT & T Techs., Inc. v. Comm's Workers of Am.*, 475 U.S. 643, 648 (1986) (quotations omitted); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."); *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 ("Arbitration under the [FAA] is a matter of consent, not coercion . . . .  By permitting the courts to 'rigorously enforce' [arbitration] agreements according to their terms, we give effect to the

1  contractual rights and expectations of the parties, without doing violence to the policies behind by the

2  FAA.") (internal citation omitted).

3  Here, the parties agree that Postmates and couriers have entered into an agreement to arbitrate

4  disputes such as the worker classification claims that underlie this action.  *See* Mot. 1.  But Postmates

5  vigorously disputes whether the parties have agreed to arbitrate those disputes *in the manner that*

6  *Petitioners demand*.  Because Postmates never agreed to the class arbitration that Petitioners and

7  AAA seek to impose, the Court should deny Petitioners' Motion.

8  **A.      Petitioners' Class Arbitration Demands Violate the Law and the Fleet Agreement**

9  The fundamental policy underlying the FAA is that arbitration is "cheaper and faster than

10  litigation."  *Allied-Bruce Terminix Co., Inc. v. Dobson*, 513 U.S. 265, 280 (1995) (quoting H.R. Rep.

11  No. 97-542, at 13 (1982)).  That policy is "of particular importance" to the resolution of disputes

12  involving independent contractors or employees, since "[a]rbitration agreements allow parties to

13  avoid the costs of litigation" in matters that "often involve[] smaller sums of money than disputes

14  concerning commercial contracts."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123 (2001).

15  The Supreme Court has explained time and again that arbitration on a class or collective basis

16  is anathema to the FAA.  "Class arbitration is not only markedly different from the 'traditional

17  individualized arbitration' contemplated by the FAA, it also undermines the most important benefits

18  of that familiar form of arbitration."  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019).  That

19  is because "class arbitration sacrifices the principal advantage of arbitration—its informality—and

20  makes the process slower, more costly, and more likely to generate procedural morass than final

21  judgment."  *Concepcion*, 563 U.S. at 348.  Indeed, the Court has held that class arbitration poses an

22  existential threat to the FAA's purpose:  "the virtues Congress originally saw in arbitration, its speed

23  and simplicity and inexpensiveness, would be shorn away and arbitration would wind up looking like

24  the litigation it was meant to displace."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1623 (2018).

25  Because of the "'fundamental' difference between class arbitration and the individualized

26  form of arbitration envisioned by the FAA," *Lamps Plus*, 139 S. Ct. at 1416 (citation omitted), "it

27  cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an

28  arbitrator," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010).  "[A] party may

not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 684. And, as *Epic Systems* made clear, the Court's hostility toward collective arbitration is not limited to the specific scenario in which a claimant seeks to invoke class-specific procedures; rather, it encompasses *any* mass arbitration tactic that threatens to fundamentally undermine the congressionally recognized benefits of bilateral arbitration. "Just as judicial antagonism toward arbitration before the Arbitration Act's enactment 'manifested itself in a great variety of devices and formulas declaring arbitration against public policy,' *Concepcion* teaches that *we must be alert to new devices and formulas that would achieve much the same result today*." *Epic Sys.*, 138 S. Ct. at 1623 (quoting *Concepcion*, 563 U.S. at 342) (emphasis added).

Petitioners' gambit of simultaneously submitting thousands of generic, identical purported arbitration demands while maintaining that they are actually brought on an "individual" basis in order to impose maximum costs on Postmates (and therefore to exert coercive settlement pressure) is "just such a device." *Id.* Allowing Petitioners to shake down Postmates for millions of dollars of fees with no regard whatsoever to Petitioners' ability to pursue their claims or their merits turns the FAA completely on its head by rendering alternative dispute resolution *more expensive* and *less efficient* than *litigating*—let alone than bilateral arbitration.

Petitioners' strategy flouts the Fleet Agreement's unambiguous class and representative action waivers. *E.g.*, Campbell Decl. ¶ 5, Exs. A § 11B(ii), B § 10B(ii) ("Postmates and [couriers] mutually agree that any and all disputes or claims between the Parties will be resolved in individual arbitration. The Parties further agree that by entering into this Agreement, they waive their right to have any dispute or claim brought, heard or arbitrated as a class and/or collective action, . . . ."); *id.* ¶ 5, Exs. A § 11B(ii), B § 10B(iii) ("Postmates and [couriers] mutually agree that any and all disputes or claims between the Parties will be resolved in individual arbitration. The Parties further agree that by entering into this Agreement, they waive their right to have any dispute or claim brought, heard or arbitrated as a representative action.").

Petitioners' labeling of their submissions to AAA as "individual" arbitration demands is a sham. "[C]ourts consistently prioritize substance and function over form when characterizing the nature of a dispute or claim" and "'need not accept the label' a party places on a claim." *AT & T*

Gibson, Dunn & Crutcher LLP

*Mobility LLC v. Bernardi*, 2011 WL 5079549, at *6 (N.D. Cal. Oct. 26, 2011) (quoting *Gen.*
*Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1998)).  In *Bernardi*, the court
preliminarily enjoined arbitration proceedings where claimants "nominally filed their arbitration
demands as individuals, and do not explicitly purport to represent anyone but themselves
individually," but in actuality were "represented by the same firm, filed essentially identical
arbitration demands," and "all [sought] the same, non-individualized relief."  *Id.*; *see also Desimoni*
*v. TBC Corp.*, 2017 WL 1381600, at *3 (M.D. Fla. Apr. 18, 2017) (enforcing arbitration agreement's
requirement of "individual" claims by ordering class arbitration claimants to proceed individually).

   Even a cursory review of the purported demands in this matter reveals that they, too, are
substantively class arbitration demands in nature:

   *First*, the purported demands were originally filed as *one* grievance document submitted to
AAA along with a spreadsheet of names and addresses purporting to make that document equally and
interchangeably applicable to thousands of individuals.  Evangelis Decl. Ex. C.  Unsurprisingly, the
grievance document contained no facts whatsoever pertaining to *any* particular prospective claimant.
*See id.*  In fact, the purported demand's legal claims do not even specify to which claimants they
apply, such as the claim entitled "Applicable Municipal Codes," which lists twenty different
municipal code provisions from various municipalities around the state of California, and asserts
generally that "in various weeks," various unspecified claimants were underpaid for work in various
of the listed cities.  *Id.* ¶¶ 62–64.[6]  These demands fail to satisfy even the most basic terms of the
parties' agreement, which plainly requires that a "demand for arbitration . . . state[] . . . the legal and
factual basis" of the petitioner's claim, and more fundamentally, that arbitration be conducted "on an
individual" rather than class basis.  Campbell Decl. Exs. A § 11B(i), B § 10B(i) (emphasis added).

   *Second*, Petitioners' counsel has been strategically (and openly) manipulating the volume and
timing of his purported clients' claims in order to create pressure on Postmates that is more akin to

---

[6]  On June 10, a week after commencing this litigation, Petitioners resubmitted their purported
demands with a separate demand form for each purported claimant, each of which copies and
pastes a shortened version of the original grievance document.  The effect is, if anything, even
less compliant with the Fleet Agreement, considering that the resubmitted demands (1) remain
identical, generic. interchangeable, and untethered to any particular claimant's factual or legal
claims for relief; and (2) now provide even *fewer* facts about each claimant as a result of the
truncation of the asserted grounds and claims for relief.  Evangelis Decl. ¶ 14.

Gibson, Dunn &
Crutcher LLP

class action litigation than the bilateral arbitration specifically mandated by the Fleet Agreement. *See*, *e.g.*, *Dalton v. Lee Publications, Inc.*, 625 F.3d 1220, 1221 (9th Cir. 2010) (noting the "unique settlement pressures of class action suits"); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996) (noting that class action "settlements have been referred to as judicial blackmail").  For example, in their initial demand letter, Petitioners' counsel used the *collective* costs of administering arbitrations as a sword, explicitly threatening to "proceed with every arbitration simultaneously" unless the parties could "agree on an alternative process for resolving [his] clients' claims." Evangelis Decl. ¶ 4 & Ex. A.  Again, Petitioners' purported demands disregard the Fleet Agreement's express waiver of class or collective arbitrations, nor does it offer any plausible roadmap for how Petitioners plan to proceed with thousands of arbitrations "simultaneously."

  *Third*, at Petitioners' counsel's urging, AAA has been administering Petitioners' purported arbitration demands on a classwide, rather than individual, basis for every conceivable purpose.  For instance, AAA has assigned one administrator to all 5,274 purported claims (*Id.* ¶ 7); has made across-the-board determinations regarding the applicability of Petitioners' several thousand asserted fee waiver affidavits[7] (*id.*); has sought to push the parties to conduct a collective mediation (*see id.* ¶ 9); and has imposed categorical administrative fee payment ultimatums that apply equally to every Petitioner's purported demand, notwithstanding differing factual circumstances and demand submission dates to AAA (*id.* ¶¶ 12, 15).

  And *fourth*, even the nature of the instant litigation confirms that Petitioners seek *collective* relief so that they may move forward with the *classwide* arbitration they desire.  5,274 Petitioners have joined this *single* lawsuit to ask this Court for a *single* order compelling Postmates to move forward on *each* arbitration demand purportedly filed by Petitioners, without considering *any* individualized questions or issues of proof applicable to *any* particular Petitioner (such as, for

---

[7]  AAA's determination that 4,593 Petitioners are entitled to fee waivers under California Code of Civil Procedure section 1284.3 is particularly dubious, since that statute, by its own terms, applies only in "*consumer* arbitrations," which are defined in California's Ethics Standards for Neutral Arbitrators in Contractual Arbitration as those in which an individual was "required to accept" an arbitration provision.  *See* https://www.courts.ca.gov/documents/ethics_standards_neutral _arbitrators.pdf.  The Fleet Agreement, however, provides that "[a]rbitration is not a mandatory condition of [couriers'] contractual relationship with Postmates" (*e.g.*, Campbell Decl. ¶ 6), and allows couriers to opt out of arbitration within 30 days of accepting the Fleet Agreement.  *Id.*

Gibson, Dunn &
Crutcher LLP

instance, which Fleet Agreement controls the individual's contractual relationship with Postmates, or, indeed, whether the individual even *has* a contractual relationship with Postmates).  *See* Mot. 13. Petitioners' failure to submit proof sufficient to establish this basic, threshold issue of contract formation *alone* is sufficient grounds to deny Petitioners' motion.  9 U.S.C. § 4 ("[U]pon being satisfied that the *making of the agreement for arbitration . . . is not in issue*, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.") And it perfectly illustrates the danger of Petitioners' shakedown strategy:  AAA has sought to collect over $11 million in fees from Postmates without any assurance that the individuals Keller Lenkner claims to represent have *ever* entered into a contract with Postmates.  Further, even Petitioners' attempted class-action-by-joinder is improper because it does not "comport with the principles of fundamental fairness" and "would result in prejudice."  *See*, *e.g.*, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296–97 (9th Cir. 2000) (affirming district court's decision to sever claims where allowing *ten* co-plaintiffs to proceed in one action would not "'comport with the principles of fundamental fairness' or would result in prejudice to either side") (quoting *Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980)).

In short, Petitioners' purported arbitration demands are *exactly* the type of class, collective, and representative action that Petitioners explicitly waived by assenting to the Fleet Agreement and declining to exercise their arbitration opt-out rights.   In the face of such waivers, courts have enjoined attempts to arbitrate on a classwide basis.  See, *e.g.*, *Bernardi*, 2011 WL 5079549, at *6. And Petitioners cannot point to a single case in which a court has ordered parties to proceed with *de facto* class or representative arbitrations notwithstanding an unambiguous waiver.

**B.    The Fleet Agreement's Delegation Clause Does Not Justify the Relief Petitioners Seek**

Petitioners seek to prevent this Court from evaluating whether they have complied with the parties' arbitration agreement so as to trigger *any* duty on the part of Postmates, asserting that "the fact that the parties have entered into a valid arbitration agreement is sufficient by itself to compel arbitration, because Postmates's Fleet Agreement delegates to the arbitrator any question regarding the scope of the arbitration agreement."  Mot. 9–10.  But Petitioners fail to mention that the delegation clause explicitly reserves issues related to the class, collective, and representative action

waivers for determination by a court:  "the [delegation] clause shall not apply to any dispute relating to or arising out of the Class Action Waiver and Representative Action Waiver, which *must* proceed in a court of competent jurisdiction and *cannot* be heard or arbitrated by an arbitrator."  Campbell Decl. Ex. B § 10A(ii)] (emphasis added); *see also id.* Ex. A § 11B(iv) ("any claim that all or part of this Class Action Waiver and/or Representative Action Waiver is unenforceable, unconscionable, void, or voidable shall be determined only by a court . . . and not by an arbitrator").  As described in Section III.A, *supra*, Petitioners' arbitration demands are substantively class demands, so Petitioners' motion raises a dispute related to the enforceability and scope of that waiver.

And even if the Fleet Agreement did not reserve issues regarding the Fleet Agreement's individualized arbitration requirements to a court, that would *still* be an issue for this Court's determination, because, following *Concepcion* and *Lamps Plus*, a court may not order parties to proceed to arbitration on a collective basis without first ensuring that the parties' contract provides for such a proceeding.  *E.g.*, *Lamps Plus*, 139 S. Ct. at 1416 ("[C]ourts may not infer consent to participate in class arbitration absent an affirmative 'contractual basis for concluding that the party agreed to do so.'  Silence is not enough; the 'FAA requires more.'") (quoting *Stolt-Nielsen*, 559 U.S. at 687).  Put simply, Petitioners have failed to meet their burden of establishing that "there is clea[r] and unmistakabl[e] evidence" that the parties agreed to submit *this* arbitrability question to an arbitrator, so the Court "should not assume that the parties agreed to arbitrate arbitrability" on this issue.  *First Options*, 514 U.S. at 944 (quotations omitted).

The FAA does not require this Court to ignore the shakedown tactics of Petitioners' counsel.[8]

---

[8]  Postmates is not the only company that has been ensnared in what is quickly becoming a clear pattern of unethical conduct by Keller Lenkner.  In just the past two years, that firm has also:

(1) employed similar *de facto* class arbitration demands in an attempt to extort Uber Technologies, Inc. (*see* Motion to Compel Arbitration, *Abadilla v. Uber Techs., Inc.*, Case No. 3:18-cv-07343-EMC (N.D. Cal. filed Dec. 5, 2018));

(2) been sued by a putative class of Uber independent contractors for falsely claiming to represent them and using unethical "bait and switch" tactics in its advertising and engagement agreements (*Brown v. Keller Lenkner, LLC*, Case No. 1:18-cv-12423-NMG (D. Mass. 2018)); and

(3) been disqualified from representing individuals asserting claims against Uber because one of its attorneys "owed a duty of confidentiality to Uber" after working closely with the company in a former position with the U.S. Chamber of Commerce (Order Granting Motion to Disqualify, *Diva Limousine v. Uber Techs., Inc.*, Case No. 3:18-cv-05546-EMC (N.D. Cal. Jan. 9, 2019)).

Gibson, Dunn &
Crutcher LLP

Quite the opposite:  "Just as judicial antagonism toward arbitration before the Arbitration Act's enactment 'manifested itself in a great variety of devices and formulas declaring arbitration against public policy,' *Concepcion* teaches that **we must be alert to new devices and formulas that would achieve much the same result today**."  *Epic Sys.*, 138 S. Ct. at 1623 (quoting *Concepcion*, 563 U.S. at 342) (emphasis added).  Keller Lenkner hopes to exploit a loophole in the AAA arbitration administration process to exact a quick and lucrative settlement by bringing a class arbitration demand in substance, but convincing AAA to invoice Postmates separately for each purported claimant.  To do so, Keller Lenkner, a twelve-attorney law firm that appears to have *one* California-admitted attorney, has postured to AAA and Postmates that it has the capacity to simultaneously prosecute over 5,000 arbitrations in California, and AAA has accepted that assertion without any regard to its facial absurdity.  As Mr. Keller's initial letter to Postmates made clear, in reality, Petitioners have no intention of prosecuting these claims individually:  they simply seek an order requiring "Postmates to [] pay all arbitration filing fees due for Petitioners pending demands for arbitration within 14 days" so that they may use it as further settlement leverage without having to address the merits of Petitioners' claims.

As Postmates has explained to Petitioners and AAA, it is certainly willing to arbitrate, and to pay fees for any arbitration that actually will go forward.  But Petitioners' tactic of seeking to coerce settlement by simultaneously imposing fees for over 5,000 arbitrations, regardless of whether those arbitrations can actually go forward, poses an existential threat to the purpose of the FAA, and this Court should not allow it.

## IV.    CONCLUSION

Postmates stands by its Mutual Arbitration Provision.  It is ready and willing to arbitrate disputes brought pursuant to the terms of that agreement.  But Petitioners' purported demands fall well short of the mark.  Postmates respectfully requests that this Court deny Petitioners' Motion because it seeks to force the parties to arbitrate in a manner to which they never agreed.

//

//

//

1

Dated:  June 17, 2019

GIBSON, DUNN & CRUTCHER LLP

2

3

By:      */s/ Theane Evangelis*
Theane Evangelis

4

Attorneys for Respondent POSTMATES INC.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28