Ashley Keller (*pro hac vice*)
  ack@kellerlenkner.com
Travis Lenkner (*pro hac vice*)
  tdl@kellerlenkner.com
Marquel Reddish (*pro hac vice*)
  mpr@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220

Warren Postman (*pro hac vice*)
  wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 749-8334

Keith A. Custis (#218818)
  kcustis@custislawpc.com
CUSTIS LAW, P.C.
1875 Century Park East, Suite 700
Los Angeles, California 90067
(213) 863-4276

*Attorneys for Petitioners*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| JAMAL ADAMS, et al., | Case No. 4:19-cv-03042-SBA |
| Petitioners, | **DECLARATION OF WARREN POSTMAN IN SUPPORT OF PETITIONERS' REPLY TO POSTMATES'S RESPONSE TO ORDER TO SHOW CAUSE RE CONTEMPT** |
| vs. | |
| POSTMATES INC., | **Judge:** Hon. Saundra B. Armstrong |
| Respondent. | |

DECLARATION OF WARREN POSTMAN
CASE NO. 4:19-cv-03042-SBA

I, Warren Postman, declare based on personal knowledge as follows:

1. I am a partner at Keller Lenkner LLC, counsel for Petitioners in this matter.

2. I have personal knowledge of the facts stated herein, and if called upon as a witness, I could and would testify competently thereto.

3. This declaration is submitted in support of Petitioners' Reply to Postmates's Response to Order to Show Cause Re Contempt.

4. True and correct copies of the email communications between Keller Lenkner, Postmates's outside counsel at Gibson Dunn & Crutcher LLP, and the American Arbitration Association ("AAA") through November 26, 2019 are attached as exhibits to the Declaration of Ashley Keller in support of Petitioners' Motion for an Order to Show Cause, Dkt. No. 257.

5. Attached as Exhibit A to this declaration is a true and correct copy of the email communications involving Keller Lenkner, Gibson Dunn, and AAA from November 27, 2019 through today.

6. Between November 27, 2019 and December 11, 2019—after AAA had administratively closed all of Petitioners' arbitrations for Postmates's failure to submit the required filing fees, and up until hours before Postmates filed its opposition brief—Postmates's outside counsel asked AAA seven times to (i) "administratively re-open" all of Petitioners' arbitrations but proceed with only 50 of them, and (ii) explain how it plans to administer Petitioners' closed arbitrations. *See generally* Ex. A.

7. In communications with AAA and Postmates's outside counsel, Keller Lenkner has repeatedly stated that we welcome Postmates's decision to move forward with individual arbitrations for 50 Petitioners and have no objection to commencing those arbitrations, so long as that commencement is not conditioned on AAA holding the remaining 5,205 demands in abeyance pending completion of the first 50 arbitrations:

> If Postmates identified a subset of 50 Claimants and paid its share of the filing fees necessary to move their cases forward, we of course would have no objection to AAA's reopening <u>those Claimants'</u> cases so they could proceed. But Postmates's willingness to proceed with 50 Claimants' arbitrations would not help the remaining Claimants, whose cases have been closed because of Postmates's refusal

to pay the fees necessary to commence <u>their</u> arbitrations. Unfortunately, the remaining 5,205 Claimants still would be required to continue to seek judicial relief to force Postmates to arbitrate with them.

Ex. A at 6.

Postmates has not simply said it wants to pay the fees for 50 individual arbitrations; rather, it has conditioned its willingness to proceed with 50 arbitrations on indefinitely delaying the other 5,205 arbitrations. Claimants do not object to Postmates moving forward with 50 arbitrations but, since we insist on each arbitration being treated individually, we do not agree to Postmates conditioning this step on the remaining arbitrations being reopened and held in abeyance.

*Id.* at 5.

If Postmates truly wants to proceed with 50 arbitrations without conditions, it should identify those individuals and pay the requisite filing fees so the process can commence as to those 50 claimants. We will not participate in your decision regarding for whom Postmates will move forward and for whom it will continue to violate its obligation to arbitrate. But nothing is stopping Postmates from moving forward with 50 arbitrations of its choosing.

*Id.* at 7.

8.  AAA has repeatedly stated that it will reopen the arbitrations of any Petitioners for whom Postmates satisfies AAA's filing-fee requirements, but that it will not reopen the arbitrations of any Petitioners for whom Postmates has not satisfied AAA's requirements:

We note the parties are exchanging emails regarding 50 cases moving forward, but there does not seem to be an agreement relative to the remaining 5,205 cases. Unless there is an agreement between the parties, these matters remain closed. The AAA will re-open these matters if the parties provide a joint agreement of how they wish to proceed, which includes remittance of the appropriate filing fees.

Ex. A at 3.

As advised in previous communications, the filing requirements, including remittance of the proper fees, must be met in order for AAA to move forward with administration. Therefore, aside from the 50 cases in which Respondent has stated they will remit payment, the other matters remain closed.

*Id.* at 11.

Upon receipt of Respondent's filing fees, we will proceed with administration of the aforementioned 50 individual demands for arbitration. All other matters remain closed. Should Respondent meet their filing fee obligation for those matters, we

will proceed with administration and consider any requests for pre-screening of arbitrators or other information at that time. Inasmuch as the closed cases are not pending before AAA, we will not consider or respond to any further correspondence on those cases.

*Id.* at 20.

9. On December 13, 2019, AAA stated that it had "locate[d] the governing contracts for each individual claimant" for whom Postmates would like to proceed with arbitration, and that it was invoicing Postmates for the filing fees necessary to proceed with those 50 Petitioners' arbitrations. *Id.* at 20.

10. As of today, we have received no indication that Postmates has paid the $95,600 in filing fees it owes to proceed with those 50 Petitioners' arbitrations.

11. On December 10, 2019, Postmates's outside counsel sent a letter to AAA raising—for the first time—objections to certain Petitioners' demands, including that (i) certain Petitioners supposedly have not accepted any version of the Fleet Agreement; (ii) certain Petitioners supposedly have not made any deliveries for Postmates; and (iii) certain Petitioners supposedly released their claims against Postmates as part of a class-action settlement. Attached as Exhibit B is a true and correct copy of that letter.

12. Throughout the pendency of this action, and for months beforehand, Petitioners' counsel have repeatedly offered to meet and confer with Postmates's counsel regarding any Petitioner who Postmates contends never signed an arbitration agreement with Postmates.

13. Two of Postmates's outside lawyers at Gibson Dunn, James Fogelman and Theane Evangelis, also are counsel for DoorDash, Inc. in a similar action in this District, brought by Petitioners' counsel on behalf of thousands of DoorDash couriers seeking to compel DoorDash to arbitrate their misclassification claims. *See* Pet. Compel Arbitration, *Abernathy v. DoorDash, Inc.*, No. 3:19-cv-07545-WHA (Nov. 15, 2019), ECF. No. 1. In connection with that case, DoorDash initially argued that "15-20% or more" of petitioners never signed an arbitration agreement with DoorDash. After the Court ordered DoorDash to search its records for email addresses and other data points provided by Petitioners' counsel—even though Petitioners' counsel had provided that

information months earlier—DoorDash located 97% of those petitioners in its records within a matter of a few days. That was before Petitioners' counsel provided supplemental information to help DoorDash identify the remaining 3%.

14. Despite knowing that Petitioners' counsel is capable of assisting Postmates in locating a very high percentage of Petitioners in its records, Mr. Fogelman did not offer to meet and confer with Petitioners' counsel before representing to AAA and this Court that 1,299 Petitioners "indisputably have no claims." Resp. at 3.

15. Postmates appears to have searched its records only for Petitioners' first and last names, rather than running searches using Petitioners' email addresses, phone numbers, and other data points that Petitioners have provided and that Postmates has had in its possession for many months. *See* Decl. of Dhananjay Manthripragada ¶ 32, Dkt. No. 262-1 ("Postmates cannot guarantee that each overlapping name corresponds to the same person, but that so many names match raises questions about who actually represents these individuals"). We asked Mr. Fogelman to identify the data points Postmates used to conduct its search, so that we can supplement that information, but neither Mr. Fogelman nor any of Postmates's other outside lawyers ever explained how Postmates conducted its search.

16. Although Postmates should not be allowed to introduce new factual arguments in the context of a contempt motion, Petitioners' counsel remains willing to engage in a good faith meet-and-confer process regarding any Petitioners who Postmates contends should not proceed with arbitration. Given the perfunctory nature of Postmates's search, Petitioners' counsel believes that Postmates's lists of Petitioners who supposedly "have no claims," Resp. at 3, are unreliable at best and should not be credited, particularly in the context of a contempt motion. But if Postmates established to the satisfaction of Petitioners' counsel that any Petitioner did not have a valid claim or a basis to seek arbitration, counsel would withdraw that Petitioner's claim.

17. In our experience representing large numbers of gig-economy workers bringing misclassification claims, it is not uncommon for some workers to retain multiple law firms to bring the same or related claims. When Keller Lenkner learns that a client has retained another law firm

to bring the same claim, we consult with the client and coordinate with co-counsel to determine how best to manage the client's litigation. Each Petitioner has retained Keller Lenkner to bring misclassification claims against Postmates. As we have noted before, *see, e.g.*, Petitioners' Reply Supp. Mot. Compel at 10, Dkt. No. 202, Petitioners' counsel would be happy to provide this Court with any engagement letters it may wish to review *in camera*.

18. On November 27, 2019, during a meet and confer between Petitioners' counsel and Postmates's counsel regarding their respective motions, Postmates's counsel suggested that Postmates was planning to file a motion to stay this Court's Order, and counsel proposed that Petitioners delay the filing of their contempt motion to coincide with Postmates's filing of its motion to stay, and that the parties both file their motions on December 2, 2019.

I affirm that the foregoing is true under penalty of perjury under the laws of the United States.

Signed on December 18, 2019 in Chicago, Illinois

/s/ Warren Postman
Warren Postman